## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

**3M INNOVATIVE PROPERTIES COMPANY** and **3M COMPANY**,

        Plaintiffs,

vs.

**ENVISIONWARE, INC.,**

        Defendant.

Civil No. 09-cv-01594-ADM-FLN

## PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF

## I.      Introduction

3M's opening brief identified two fundamental problems with EnvisionWare's proposed claim constructions.  First, EnvisionWare seeks to construe several claim terms with readily apparent plain and ordinary meanings, and courts do not need to construe such terms.  Second, many of EnvisionWare's proposed constructions impermissibly narrow the meanings of terms by importing limitations into them.  Now with the benefit of EnvisionWare's opening claim construction brief, we can more clearly understand how EnvisionWare arrived at its flawed constructions.

EnvisionWare's approach to claim construction commits three fundamental legal errors:  (1) it fails to consider all relevant intrinsic evidence; (2) it improperly applies the doctrine of prosecution history disclaimer to narrow the meaning of claim terms; and (3) it improperly relies on expert testimony that is inconsistent with the intrinsic evidence.  Beyond these legal errors, the evidence and explanations EnvisionWare offers in support of its proposed constructions often do not actually support its proposed constructions— "an algorithm" and "trigger" present two such examples.

In the end, the parties dispute ten claim terms in three patents.  With respect to five of these terms, 3M respectfully requests that the Court decline to construe them because their meanings are readily understood.  *See 3M Innovative Props. v. Gerson*, Civil No. 08-4960-JRT-FLN (D. Minn. Oct. 10, 2010) (citing *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) in finding that the plain and ordinary meaning of several disputed claim terms governed and that no construction was necessary) (attached at Declaration of Andrew F. Johnson in Support of Plaintiffs' Reply

Claim Construction Brief (hereinafter "Johnson Decl."), Ex. M.); *Caddy Prods., Inc. v. Am. Seating Co.*, Civ. No. 05-800, 2008 WL 2447294, at *2 (D. Minn. June 13, 2008). With respect to the remaining five disputed terms, 3M's proposed constructions align with the intrinsic evidence and comport with the law of claim construction.  For the reasons set out in 3M's opening claim construction brief and further set out below, 3M respectfully requests that the Court adopt its proposed constructions for these terms.[1]

## II.     EnvisionWare Makes Three Fundamental Mistakes in Addressing Claim Construction

### A.     EnvisionWare Ignores and Does Not Adequately Account for All Relevant Intrinsic Evidence

First, EnvisionWare's proposed constructions often do not adequately take into account all relevant intrinsic evidence or, worse, ignore key parts of it.  For example, with respect to the term "an algorithm" from the '870 patent, EnvisionWare ignores the context of claim 6 in which the term "algorithm" appears, does not address claim 10 which further describes the "algorithm" of claim 6, and improperly parses the relevant portion of the specification.  (Defendant EnvisionWare, Inc.'s Opening Claim Construction Brief, Dkt. No. 74 (hereinafter "EnvisionWare Br.") at 12-13.)

---

[1]     The disputed terms for which 3M believes no construction is necessary are:  (1) "controller"; (2) "remind"; (3) "so that the loan transactions can be later transferred to the circulation system"; (4) "received signals"; and (5) "a trigger for intermittent activation of the device."  The disputed terms for which 3M offers constructions are:  (1) "an algorithm"; (2) "obtaining"; (3) "input information to the RFID device as to that item"; (4) "integrated unit"; (5) "substantially simultaneously."  3M further notes that the parties agree that no construction is necessary for the term "inputting information" of the '870 patent.  (*Cf.* EnvisionWare Br. at 20.)

Consistent with this problem, EnvisionWare often seeks to import aspects of preferred embodiments to limit the scope of claim terms.  In doing so, it violates the tenet against importing limitations from the specification into the claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc); *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998).  For example, with respect to the term "obtaining" of the '870 patent, EnvisionWare cites only one portion of the specification in support of its narrowing construction.  (EnvisionWare Br. at 16.)  But EnvisionWare does not mention that the cited language is introduced as a mere embodiment of the invention, or that the specification details seven other examples which illustrate that "obtaining" in the context of the '870 patent is broader than EnvisionWare's narrowing construction.  ('870 Patent, 16:36-18:28.)

## B.      EnvisionWare Misapplies the Doctrine of Prosecution History Disclaimer

Next, EnvisionWare cites the doctrine of prosecution history disclaimer in support of three of its constructions:  "input information to the RFID device as to that item;" "integrated unit;" and "trigger."  Prosecution history disclaimer applies, however, only when there is a "***clear and unmistakable***" disclaimer of claim scope during prosecution. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003) (emphasis added); *see also id.* at 1324 ("[W]here the patentee has ***unequivocally disavowed a certain meaning*** to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender.") (emphasis added).  But at no point does EnvisionWare identify any clear and

unmistakable statement during prosecution that disavows any specific claim scope. (EnvisionWare Br. at 18-19, 21-23, 31-32.)  Moreover, with respect to "integrated unit," for example, EnvisionWare does not even identify what claim scope it contends 3M disavowed during prosecution.  (EnvisionWare Br. at 21-23.)

### C.     EnvisionWare Improperly Relies on Expert Testimony

Finally, EnvisionWare's approach is at odds with the law of claim construction because it impermissibly relies on extrinsic evidence, such as expert testimony, to support its constructions.  As the Federal Circuit has made clear, "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Similarly, a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Phillips*, 415 F.3d at 1318 (quotations omitted).  This is precisely the kind of expert testimony that EnvisionWare relies on.

At his deposition, EnvisionWare's expert, Dr. Bandy, admitted that prior to 1998, the effective filing dates of the asserted patents, he was "not involved in the RFID field at all."  (Johnson Decl., Ex. N at 94:18; *see also id.* at 94:15-95:13.)  Dr. Bandy's expert declaration also is incomplete because it does not consider several pieces of intrinsic evidence critical to the meaning of the terms on which he opines.  For example, with respect to the term "substantially simultaneously" of the '780 patent, the patent discloses several RFID tags that can be used with the claimed integrated, hand-held RFID device. ('780 Patent, 5:48-53.)  Significantly, each of the disclosed tags operates using an anti-

collision protocol for reading multiple tags substantially simultaneously known as time division multiple access ("TDMA").  (Rebuttal Expert Declaration of Dr. Daniel van der Weide (hereinafter "van der Weide Decl."), ¶34.)  This strongly suggests—if not conclusively shows—that the claimed device of the '780 patent covers devices that use TDMA technology.  *Chimie v. PPG Indus.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005) ("[A] construction that would not read on the preferred embodiment, would rarely if ever [be] correct and would require highly persuasive evidentiary support.") (citations and quotations omitted).

Dr. Bandy's construction, however, ***excludes*** devices that operate based on TDMA.  (Expert Declaration of William R. Bandy Ph.D, September 22, 2010 (hereinafter "Bandy Decl."), ¶64.)  This is especially problematic because his declaration never even acknowledges this critical intrinsic evidence, let alone explains why his construction, which excludes preferred embodiments, is somehow proper.  Because Dr. Bandy offers unsupported opinions that are inconsistent with the intrinsic evidence, his opinions are precisely the kind that the Federal Circuit has deemed "not useful to a court." *Phillips*, 415 F.3d at 1318.

The following chart sets out a summary of the fundamental legal errors underlying EnvisionWare's proposed constructions:

| A | EnvisionWare Ignores and Does Not Adequately Account for All Relevant Intrinsic Evidence |
|---|---|
| B | EnvisionWare Misapplies the Doctrine of Prosecution History Disclaimer |
| C | EnvisionWare Improperly Relies on Expert Testimony |

| Term | EnvisionWare's Analysis (Opening Brief) | EnvisionWare's Fundamental Legal Errors |
|---|---|---|
| "controller" | 4-7 | None |
| "remind" | 7-8 | A |
| "so that the loan transactions can be later transferred to the circulation system" | 8-10 | A |
| "an algorithm" | 12-14 | A |
| "received signals" | 14-15 | A, C |
| "obtaining" | 15-18 | A |
| "input information to the RFID device as to that item" | 18-20 | A, B |
| "integrated unit" | 21-23 | A, B |
| "substantially simultaneously" | 23-30 | A, C |
| "a trigger for intermittent activation of the device" | 30-33 | A, B, C |

### III.   3M's Proposed Constructions Are Correct and the Court Should Decline to Construe the Terms Identified by EnvisionWare that Do Not Require Construction

#### A.   '568 Patent – Self-Service Library Terminal

#### 1.   "controller" ('568 Patent, Claims 6, 7, 8, 9, 15, 16, and 22)

| 3M Proposed Construction | EnvisionWare's Proposed Construction |
|---|---|
| No construction necessary.<br><br>Alternatively, "a device that receives, stores, processes, and/or provides information to various devices." | "A device that controls the operation of the recited elements of the self-service library terminal." |

From EnvisionWare's brief, it appears that the parties are actually in substantial agreement as to the meaning of "controller" in the relevant claims.  In other words, the parties appear to agree that the claimed "controller" should be capable of performing the functions recited in the relevant claims, *e.g.*, claims 6 and 9.[2]  (*See* EnvisionWare Br. at 5; Plaintiffs' Opening Claim Construction Brief, Dkt. No. 71 (hereinafter "3M Br.") at 14.)  Thus, the only question is whether any further construction of this term is necessary.

But as explained in 3M's opening brief, EnvisionWare's construction is redundant of the meaning already conveyed by the remainder of the claim language.  (3M Br. at 14.) EnvisionWare itself admits that its construction is meant to capture the ordinary meaning of controller in view of the requirements of the claims.  (EnvisionWare Br. at 5.)

---

[2]     EnvisionWare's assertion that in this litigation 3M has taken a position contrary to the arguments it is making during reexamination of the '568 patent is unfounded.  3M's alternative construction is an attempt to capture the express requirements of the claim language, not to impermissibly broaden the scope of the claims as EnvisionWare suggests. In any event, 3M believes that its alternative construction is unnecessary in light of EnvisionWare's agreement that "controller" should carry its ordinary meaning in view of the claim language.

Therefore, because the meaning of "controller" would be readily understood by a person having ordinary skill in the art in view of the context provided by the claims, no further construction is necessary.

### 2. "remind" ('568 Patent, Claims 6, 7, 8, 9, and 15)

| 3M Proposed Construction | EnvisionWare's Proposed Construction |
|---|---|
| No construction necessary. | "Always alert a borrower to the recited information." |
| Alternatively, "inform or alert." | |

As 3M stated in its opening brief, this is precisely the kind of non-technical term that requires no construction. *See Phillips*, 415 F.3d at 1314. 3M requests that the Court decline to adopt EnvisionWare's proposed construction because it would improperly add limitations that are not supported by the intrinsic evidence and are inconsistent with the ordinary meaning of "remind."

Interestingly, EnvisionWare's explanation for its proposed construction is inconsistent with its proposal. EnvisionWare explains that "[a] computer implemented reminder is ***triggered when a particular condition occurs***: in the case of claim 6, for example, ***when*** there is an overdue book chargeable to the borrower, the claimed controller is arranged to remind the borrower of that information." (EnvisionWare Br. at 7 (emphasis added).) Thus, according to this explanation, the term "remind" invokes an operation based on triggering conditions. But, contrary to this explanation of how a "reminder" works in the computer context, EnvisionWare's proposed construction for "remind" is "***always*** alert a borrower to the recited information" (emphasis added)—a

construction that makes no mention of triggering conditions or "reminding" being an event based on such conditions.

Worse still, EnvisionWare's proposed construction is inconsistent with relevant intrinsic evidence.   The claims require only that the "controller is ***arranged to remind*** the borrower" or that "controller ***controls the display to remind*** the borrower" of the requisite information.  ('568 Patent at Claims 6-9, 15 (34:58–37:2) (emphasis added).) There is no requirement—whether stemming from the claims themselves or the remaining intrinsic evidence—that the device must ***always*** remind the borrower of the relevant information, and EnvisionWare's own briefing refutes such a notion.

In sum, EnvisionWare's proposed construction of "remind" adds an unnecessary limitation—the term "always"— to the claims and therefore should be rejected.  The remainder of EnvisionWare's construction—"a borrower to the recited information"—is superfluous and should equally be rejected.

### 3.   "so that the loan transactions can be later transferred to the circulation system" ('568 Patent, Claims 9, 16, and 22)

| 3M Proposed Construction | EnvisionWare's Proposed Construction |
|---|---|
| No construction necessary. | "To transfer data to the circulation system over the link when the link is re-established." |

It appears that EnvisionWare has misunderstood the dispute between the parties as well as the prosecution history.  (*See* EnvisionWare Br. at 8, 9-10.)  3M does not dispute whether this limitation requires the capability for data to be transferred over the link to the circulation system after "the link" has been restored.  Indeed, 3M distinguished the

prior art on the ground that it did not disclose "storing loan transactions during periods when the link to the circulation system is down so that the loan transactions **can be later transferred** to the circulation system." (Johnson Decl., Ex. O at 29; *see generally id.* at 28-30.)  Implicit in this statement is that the loan transaction can be later transferred over the link to the circulation system.[3]

The real dispute is whether this limitation requires ***actual transfer*** of the loan transaction to the circulation system after the link has been reestablished or whether it requires only that the loan transactions ***can be later transferred*** to the circulation system. The claims themselves are resoundingly clear on this point.  They require only that the loan transaction be stored in a manner permitting later transfer to the circulation system, not actual transfer.  (*E.g.*, Claim 9 ("so that the loan transactions ***can be later transferred*** to the circulation system") (emphasis added).)  Thus, contrary to EnvisionWare, the plain and ordinary meaning of this term governs.  (EnvisionWare Br. at 9-10.)  3M respectfully requests that the Court reject EnvisionWare's construction, which improperly reads in a limitation—actual transfer of the loan transactions—and effectively attempts to transform this claim from an apparatus claim to a method claim.

---

[3]     Contrary to EnvisionWare's assertion at page 10 of its brief, 3M has never contended that transfer of information by floppy disk or manual entry would, without more, constitute infringement, and it is not clear why EnvisionWare would suggest 3M "will no doubt" so argue.

**B.** **'870 Patent – Use of a Portable RFID Device**

**1.** **"an algorithm" ('870 Patent, Claim 6)**

| 3M Proposed Construction | EnvisionWare's Proposed Construction |
|---|---|
| "Data or a list corresponding to an organizational system or a method of sorting." | "A set of rules." |

EnvisionWare ignores and fails to give proper credence to the intrinsic evidence when construing "an algorithm."  In particular, EnvisionWare does not discuss the context of the claim in which the term "algorithm" appears (claim 6) and does not mention claim 10, which further defines the "algorithm" of claim 6.  (EnvisionWare Br. at 12-13.)  Moreover, although EnvisionWare cites the relevant portion of the specification for understanding the claimed "algorithm" of claim 6 ('870 Patent, 17:21-26), EnvisionWare focuses its attention on only three isolated words from that section.  (EnvisionWare Br. at 13.)  Not surprisingly, in view of these oversights, EnvisionWare arrives at a construction of "algorithm" that is inconsistent with the intrinsic evidence.

To be sure, other portions of the specification use "algorithm" in a manner more consistent with EnvisionWare's proposed construction, such as when describing the "multi-item identification algorithm" that can be used to facilitate the reading of multiple RFID tags substantially simultaneously.  (*E.g.*, '870 Patent, 8:7-14; 13:30-36.)  However, that is not the "algorithm" of claim 6.  The meaning of "an algorithm" from claim 6 is instead "data or a list corresponding to an organizational system or a method of sorting." (*See also id.* at Claim 10 (19:37–41) ("the algorithm is ***based on an ordering system that***

*is selected from* the Dewey Decimal System, the Library of Congress System, an alphabetical listing of authors, and an alphabetical listing of topics") (emphasis added); *id.* at 17:21-26 (describing the "shelving algorithm").)

The relevant portions of the specification cited above clearly establish that 3M acted as its own lexicographer in claims 6 and 10, for example, by using the term "algorithm" to refer to something other than dictionary definitions for this term.  This is a proper and well established technique under Federal Circuit law.  *E.g.*, *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998).  Thus, contrary to EnvisionWare, 3M is not asking the Court to redraft the claims, *see Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004), but instead is asking only that "an algorithm" be given the meaning established by the relevant intrinsic evidence.

Furthermore, the evidence EnvisionWare puts forward does not support its proposed construction.  Indeed, the dictionary definition it cites calls for "any special method of solving a certain kind of problem," not a "set of rules."  Moreover, EnvisionWare highlights "methods" from "methods of sorting" at column 17, lines 21-26 of the '870 patent, but a "method" is not synonymous with a "set of rules."

2.      "received signals" ('870 Patent, Claims 1, 2, and 4)

| 3M Proposed Construction | EnvisionWare's Proposed Construction |
|---|---|
| No construction necessary. | "an electrical quantity or effect that can be varied in such a way as to convey information." |

The parties agree that "received signals" in the context of the claims of the '870 patent carries its plain and ordinary meaning.  (*See* EnvisionWare Br. at 15; 3M Brief at 19-20.)  However, contrary to EnvisionWare, the plain and ordinary meaning in the context of the '870 patent is not "an electrical quantity or effect that can be varied in such a way as to convey information."

Rather, as explained by 3M's rebuttal claim construction expert, Dr. Daniel van der Weide, "'received signals' become[] synonymous with the information they convey." (van der Weide Decl., ¶¶24-27.)  This understanding is consistent with the specification, which uses "information" synonymously with and interchangeably for the signals received from a scanned RFID tag.  (*See* '870 Patent, 16:19-25 ("In operation, a particularly useful feature of a hand-held device is ***obtaining real-time information regarding an item that has been scanned by the device***.  That is, the ***hand-held device obtains information from the RFID tag***, and either immediately displays that information, or immediately displays information stored within the hand-held device that is related to the tagged item.") (emphasis added); *see also id.* at 8:31-37.)

Furthermore, this understanding is consistent with the deposition testimony of EnvisionWare's expert, Dr. Bandy, who stated that "all [RFID] systems are designed to

actually have information be exchanged back and forth.  I don't know what the point would be of a system that wasn't getting information by design." (Johnson Decl., Ex. N at 76:17-20.)  Significantly, the information being "exchanged back and forth" would necessarily be transmitted via "signals."  Accordingly, the meaning of "received signals" in the '870 patent would be readily apparent to a person having ordinary skill, and no construction is necessary.  (van der Weide Decl., ¶¶24-27.)

EnvisionWare's construction, which seeks to define "signals" as the medium for delivering the information, but not the information itself being delivered by the signal, should be rejected.  As explained above, one of ordinary skill in the art would not impart such a technically nuanced meaning to this term in the context of the '870 patent.

### 3. "obtaining" ('870 Patent, Claims 13, 14, and 15)

| 3M Proposed Construction | EnvisionWare's Proposed Construction |
|---|---|
| "Identifying, selecting, or acquiring an item in a manner to facilitate the input of information to the RFID device as to that item." | "Gathering for interrogation." |

Here again, EnvisionWare proposes a narrowing construction that is inconsistent with the intrinsic evidence.  The only intrinsic evidence that it cites is located at column 18, lines 7-18 of the '870 patent.  But what EnvisionWare fails to note is that the cited language does not provide any express or implied limitation on the definition of "obtaining."  To the contrary, the cited portion provides:

> ***In yet another embodiment***, the hand-held device could be used to provide additional information about a specific item once the item has been obtained and its RFID tag scanned by the RFID device.  ***For example***,

> library staff **may** collect materials that have been used in the library, and
> scan those materials . . . .

('870 Patent, 7-15 (emphasis added).)  Significantly, EnvisionWare omitted "in yet

another embodiment"—*i.e.*, the language that makes it clear that the particular "example"

discussed in the specification is non-limiting.  (*See* EnvisionWare Br. at 16.)

Moreover, EnvisionWare's construction is inconsistent with the broader

discussion of the invention in the specification, which addresses, among other things,

reading books on shelves.  (*E.g.*, '870 Patent, 17:17-21 ("The RFID device of the present

invention could also be used to verify the order of materials on a shelf.  *In this mode, the*

*device is scanned across one or more rows of items.  The device reads each item* and

indicates, to the operator, which items are not shelved in the correct order.") (emphasis

added).)  In fact, the '870 patent describes *seven* embodiments of the invention beyond

the one on which EnvisionWare focuses, and *none* of these seven other embodiments

requires physical gathering of items—rather all allow the items to be read at a distance,

for example on book shelves.  (*See generally* '870 Patent, 16:36-18:47.)  Thus,

"obtaining" is necessarily broader than "gathering for interrogation."  In particular and as

the specification makes clear, the invention allows for an item to be "obtained" from a

distance by being identified, selected, or acquired, much like a target in a marksman

contest.  (*See* '870 Patent Fig. 13 reproduced below; *see also Webster's II New College*

*Dictionary* (1995) (obtain) ("To gain possession of, *esp. by intention or endeavor*")

(emphasis added).)



**Fig. 13**

In sum, when read in the context of the entire specification, 3M's proposed construction of "obtaining" "stays true to the claim language and most naturally aligns with the patent's description of the invention," while EnvisionWare's construction seeks to narrowly define the term in a manner inconsistent with the patent. *Phillips*, 415 F.3d at 1316.

4.      **"input information to the RFID device as to that item" ('870 Patent, Claims 13, 14, and 15)**

| 3M Proposed Construction | EnvisionWare's Proposed Construction |
| --- | --- |
| "Enter information to the RFID device as to the item." | "Input to the RFID device custom information observed by a user regarding the item scanned by the RFID device." |

EnvisionWare's proposed construction here seeks to apply the doctrine of prosecution history disclaimer without identifying a "clear and unmistakable" surrender

of claim scope.  *Omega Eng'g*, 334 F.3d at 1324-6.  Specifically, EnvisionWare does not

identify any statement during prosecution that clearly and unmistakably limits the

"information" of this term to "***custom*** information ***observed by a user*** regarding the item

scanned by the RFID device."  Although the prosecution history explains that "custom"

information is one kind of information that a user can input into the RFID device, 3M did

not clearly limit the ***type*** of claimed information to "custom" or "user observed"

information.[4]  Rather, 3M indicated that any kind of information may come within the

scope of claim 13.  (*See* Johnson Decl., Ex. H at 6.)  Thus, because EnvisionWare has not

identified any clear and unmistakable disavowal of claim scope to support the application

of prosecution history disclaimer, EnvisionWare's proposed construction should be

rejected.

### C.      '780 Patent – Hand-Held RFID Device

### 1.      "integrated unit" ('780 Patent, Claims 1, 2, 3, 4, 5, 6, 7, 11, and 17)

| 3M Proposed Construction | EnvisionWare's Proposed Construction |
|---|---|
| "A unit wherein the recited component parts are or can be combined into a unified structure." | "Recited components directly connected to a single housing." |

Here again, EnvisionWare seeks improperly to invoke prosecution history

disclaimer without identifying any clear and unmistakable statement of disavowal during

---

[4]  As noted in 3M's opening brief, the prosecution history only narrows the *manner* in which information is inputted into the claimed RFID device for purposes of claim 13. That is, information must be "entered," as reflected in 3M's proposed construction, rather than "uploaded" from a computer.  (*See* 3M opening br. at 23; *see also* Johnson Decl., Ex. H at 6.)

prosecution and, in fact, does not even identify the specific claim scope that

EnvisionWare contends is subject to the purported disavowal.  But worse, to make its

argument, EnvisionWare alters the intrinsic evidence.  At page 22 of its brief,

EnvisionWare provided the following figures:



These figures show an arrow pointing to a supposed "housing."  But contrary to

EnvisionWare's illustrations, no such "housing" is identified in either Figure 15 or 16 of

the '780 Patent:



In fact, the word "housing" never once appears in the specification of the '780 patent.

Moreover, 3M never once used the word housing in the response to the PTO in which it

added Figures 15 and 16, let alone made any statement that would somehow limit its

claims or the nature of its "integrated unit" to the specific configurations shown in

Figures 15 and 16. (Johnson Decl., Ex. P.)  Quite to the contrary, 3M added these figures

"to tie together what is recited in the claims with the disclosed invention."  (*Id.* at 1.)  In

view of this intrinsic record, EnvisionWare's construction, which revolves around the

concept of a "housing," is simply not supportable.

In contrast, 3M's proposed construction is consistent with the intrinsic evidence.

Indeed, claim 8, which depends from claim 1, covers a hand-held RFID device "wherein

the computer is a ***detachable*** hand-held computer."  ('780 Patent at 19:27–28 (emphasis

added).)  Thus, consistent with the intrinsic evidence and the plain and ordinary meaning

of "integrated," "integrated unit" should be construed as "a unit wherein the recited

component parts are or can be combined into a unified structure."

### 2.  "substantially simultaneously" ('780 Patent, Claims 1, 2, 3, 4, 5, 6, 7, 11, and 17)

| 3M Proposed Construction | EnvisionWare's Proposed Construction |
| --- | --- |
| "In immediate or nearly immediate succession in time." | "In substantially overlapping durations." |

EnvisionWare's proposed construction of "substantially simultaneously" is

inconsistent with the intrinsic evidence.  First, EnvisionWare's discussion of RFID

technology quickly goes to a level of technical detail not contemplated by the

specification.  Indeed, the specification never mentions the phrases time division multiple

access ("TDMA"); frequency division multiple access ("FDMA"); or code division

multiple access ("CDMA").  (*See also* Bandy Decl., ¶62; van der Weide Decl., ¶31.)

Yet, without proper grounding or justification, EnvisionWare moves to a discussion of these technologies and ultimately concludes, based solely on extrinsic evidence and expert testimony, that the claims cover FDMA and CDMA, but exclude TDMA. (EnvisionWare Br. at 25-29; Bandy Decl., ¶64.)

By way of background, each of these technologies provides for anti-collision protocols that assist in reading multiple RFID tags when all of the relevant tags are positioned within a single interrogation zone.  These protocols allow a reader to read multiple RFID tags "substantially simultaneously."  (van der Weide Decl., ¶15, 18-21.)  In this manner, the asserted claims are directed to devices for reading multiple RFID tags from a single interrogation zone "substantially simultaneously."  (*See also* '780 Patent, 2:64-3:1; 8:5-13; 13:26-36.)  Such RFID devices stand in contrast to low frequency RFID readers or devices, which are only capable of reading one RFID tag in an interrogation at a time and are not capable of reading multiple RFID tags in a single interrogation zone "substantially simultaneously."  ('780 Patent, 2:58-63; van der Weide Decl., ¶¶ 14-18, 29-30.)  The devices of the relevant asserted claims are thus improvements over the low frequency RFID devices.  (*See* '780 Patent, 2:58-3:1; 8:5-13; 13:26-36.)

While the specification does not expressly mention TDMA, FDMA, or CDMA, it does set out examples of preferred embodiments to be used in connection with the invention.  For example, the specification describes certain RFID tags for use with the invention.  ('780 Patent, 5:48-53.)  Significantly, each of the tags disclosed by the '780 patent employs TDMA technology.  (van der Weide Decl., ¶34.)

Moreover, as explained by Dr. van der Weide and as decribed by the RFID Handbook (a 1998 RFID treatise), TDMA was the only anti-collision protocol that was commonly available in 1998, while FDMA systems were "quite rare" and no real-world uses of CDMA were known.  (van der Weide Decl., ¶¶19-21.)  Accordingly, based on this state of the technology and the teachings of the '780 patent, a person of ordinary skill would understand that "substantially simultaneously" should be construed consistently with TDMA principles.  *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005); (*See also* van der Weide Decl., ¶¶ 31-37.)  It should be noted that at his deposition, even Dr. Bandy admitted that for a system such as that which would be useful for the library environment (*see, e.g.*, '780 patent, 2:64-3:1; 13:25-36), TDMA was a viable approach:  "If you have tags in an interrogation zone, you have multiple ways to read those tags. You can do TDMA. You can do FDMA. You can do CDMA."  (Johnson Decl., Ex. N at 113:14-114:7.)  And specifically for such a system, Dr. Bandy explained that "TDMA is a great, great, great, great, great approach."  (*Id.* at 115:2-3.)  Therefore, consistent with TDMA technology, which reads tags in discrete time slots (*see* Bandy Decl., ¶¶37-38; van der Weide Decl., ¶¶ 31-37), "substantially simultaneously" should be construed as "in immediate or nearly immediate succession in time," and EnvisionWare's proposed claim construction should be rejected.

### 3. "a trigger for intermittent activation of the device" ('780 Patent, Claim 17)

| 3M Proposed Construction | EnvisionWare's Proposed Construction |
|---|---|
| No construction necessary. | "**a trigger**"—"a projecting tongue or lever" "**intermittent activation of the device**"—placing the device into a separate, power-saving mode of operation as opposed to a continuous mode of operation |

This is a further example of EnvisionWare improperly attempting to invoke prosecution history disclaimer in the absence of any clear and unmistakable statements of disavowal during prosecution, failing to consider all relevant intrinsic evidence when offering its construction, and improperly relying on expert testimony.

The intrinsic evidence does not limit or restrict the nature of the claimed "trigger" to "a projecting tongue or lever" or any other specific kind of trigger. While it is certainly true that Figure 15 illustrates an embodiment of the claimed "trigger," the specification does not restrict or limit the "trigger" to that embodiment, and EnvisionWare does not cite anything from the specification in support of such a proposition. (*See* '780 Patent, 15:62-16:5.) Moreover, 3M did not make any statements at the time it added Figure 15 that would have disclaimed all triggers beyond those illustrated in Figure 15, and again, EnvisionWare does not point to any such statements. (Johnson Decl., Ex. P.) Finally, the "trigger" depicted in Figure 15 looks nothing like a "projecting tongue" or a "lever." Instead, it is a rectangular feature, not a "tongue" or a "lever." (*See* '780 Patent, Fig. 15.) Thus, the only evidence on which EnvisionWare relies for its proposed construction does not even support EnvisionWare's construction.

The plain and ordinary meaning of "trigger" should govern, and no construction is necessary.

With respect to "intermittent activation of the device," EnvisionWare relies on Dr. Bandy's expert opinion, but it was evident from Dr. Bandy's deposition that he did not have a good understanding of the scope or meaning of his own proffered construction. (Johnson Decl., Ex. N at 81-87.)  Nevertheless, Dr. Bandy was able to clarify that "placing the device into a separate, power-saving mode of operation as opposed to a continuous mode of operation," does not require that the device have started in any particular mode of operation, *i.e.*, a continuous as opposed to an off mode.  (*Id.* at 86:4-10.)  With respect to what is meant by the "separate, power-saving mode" of operation, it is not clear if EnvisionWare is intending from its construction to narrow this disputed term to have meaning that is inconsistent with the description set out by the patent: "Intermittent activation can be provided by, for example, a trigger associated with the device, so that the elapsed time for which power is required for the RFID device is minimized." ('780 patent, 16:8-13.)  But if so, EnvisionWare's construction would be improper, and because the meaning of this term is plain on its face and requires no construction, 3M respectfully requests that the Count decline to adopt EnvisionWare's proposed construction and find no construction necessary.  (van der Weide Decl. at ¶¶38-40.)

Dated:  October 22, 2010

      *s/ Theodore M. Budd*

David J. F. Gross (No. 208772)
James W. Poradek (No. 290488)
Theodore M. Budd (No. 314778)
Christopher J. Burrell (No. 386475)
Andrew F. Johnson (No. 389331)
FAEGRE & BENSON LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-3901
Telephone:  (612) 766-7000
Fax:  (612) 766-1600
Email: dgross@faegre.com;
jporadek@faegre.com;
tbudd@faegre.com;
cburrell@faegre.com;
ajohnson@faegre.com

Kevin H. Rhodes (No. 0318115)
Peter L. Olson (No. 0221491)
3M INNOVATIVE PROPERTIES
COMPANY
3M Center
P.O. Box 33427
Saint Paul, MN 55144
Telephone: (651) 736-4533
Fax: (651) 737-2948
Email: krhodes@mmm.com;
plolson4@mmm.com

**ATTORNEYS FOR PLAINTIFFS 3M
INNOVATIVE PROPERTIES
COMPANY AND 3M COMPANY**

fb.us.5884851.04